## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIE TRAVIS, on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br> vs.<br><br>NAVIENT CORPORATION and NAVIENT SOLUTIONS, INC.,<br><br>     Defendants. | Case No. |

## CLASS ACTION COMPLAINT

Marie Travis, as a federal student loan holder, brings this suit against Navient Corporation and Navient Solutions, Inc. (together, "Navient" or "Defendants"), both student loan servicers, on behalf of herself and others similarly situated, and alleges the following based on her personal knowledge and investigation of counsel:

## INTRODUCTION

1. In what has become one of the largest and fastest growing debt markets in the United States, millions of Americans currently owe over one trillion dollars in student loan debt. The massive amount of student loan debt has complicated the ability of many borrowers to repay their loans, spawning what is called the "student loan crisis."

2. The student loan crisis is the result of a myriad of converging factors, including: a growing need to complete a four-year degree to compete in the marketplace, dramatic increases in tuition at institutions offering four-year degree programs, increasing number of students borrowing money to pay for tuition, limitations on the availability of employment with pay sufficient to cover the cost of student loan payments.

3.      The result is an average student loan debt estimated to be between $28,950 and $37,172.80 per borrower.[1]

4.      Even for those making regular monthly student loan payments, student loan debt has significantly impacted borrowers' financial futures. One study found student loan debt delayed homeownership by five years, cost borrowers around $500,000 in lost retirement savings, and significantly reduced lifestyle qualities, including inability to purchase cars and generate future savings.[2]

5.      Since 2010, when the Healthcare and Education Reconciliation Act was passed, the federal government has become the largest holder of student loan debt, amassing $1.291 trillion in owed debt.[3]  The Healthcare and Education Reconciliation Act marked a change in philosophy for federal student loans.  Instead of backing private student loans and offering limited federal student loans, the federal government now offers its student loans directly to borrowers.

6.      Federal student loans provide key benefits that private student loans lack, including flexible repayment options.  Perhaps the most significant repayment options are income-driven repayment ("IDR") plans which adjust monthly loan payments according to the borrowers' annual incomes.  Eligible borrowers can apply for IDR plans and with lower monthly payments and, after 20 to 25 years of repayment, federal student loans in an IDR plan may be forgiven.

---

[1] *2016 Report on the Real Cost of Student Loans*, Student Debt Crisis (last visited, June 28, 2017), http://studentdebtcrisis.org/4782-2/.

[2] *Id.*

[3] *A Look at the Shocking Student Loan Debt Statistics for 2017*, Student Loan Hero (May 17, 2017).

7.      The federal government also allows its student loans to be entered into forbearance, which temporarily delays the monthly loan payments for a fee.  Forbearance is recommended for borrowers experiencing short-term financial circumstances preventing their ability to make their monthly loan payment.  When a borrower's financial distress is expected to be long-term, however, utilizing IDR is the preferred method of managing the borrower's student loan payments.

8.      To manage its direct federal student loan program, the federal government contracts with financial providers to service the loans, communicate with borrowers, educate borrowers about repayment options, and help borrowers apply for repayment programs like IDR.  Although the Department of Education allows servicers to determine eligibility for and enter borrowers into forbearance, borrowers seeking to enter an IDR program must submit an application and provide documentation demonstrating eligibility for IDR to the Student Aid Office.  As compared to forbearance, servicers often must invest more time and resources to determine a borrower's eligibility for IDR and to help borrowers apply.

9.      The Department of Education has regularly encouraged borrowers to contact their student loan servicers for advice and information about repayment options.  For example, the Federal Student Aid website states, "[b]efore you apply for an income-driven repayment plan, contact your loan servicer . . . [who] will help you decide whether one of these plans is right for you."[4]

10.     Navient, and other servicers, have also actively advertised their role in educating borrowers about and assisting borrowers with their repayment options.  Almost all servicers,

_____

[4] *Income-Driven Plans,* Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

including Navient, encourage borrowers to contact them if they have any issues with repayment. For example:

a. **Nelnet**. "We're here to make your student loan repayment as simple as possible. This means we: Process your monthly payment. Help you find lower monthly payment options. Guide you through the different stages of your student loan."[5]

b. **Great Lakes**. "At Great Lakes, our servicing role includes: Keeping you up-to-date with information about your student loans. Monitoring your school enrollment and status while you're in school. Assisting you as you pay back your loans. Helping you find the best repayment plan for your budget."[6]

c. **MOHELA.** "MOHELA is dedicated to providing world-class customer service for the students whose loans we manage. As your knowledgeable and approachable go-to resource for account information and repayment options, we provide the tools to help you successfully repay your student loan. MOHELA is here to assist you!"[7]

d. **OSLA.** "OSLA is available to customers via the web at www.OSLA.org, by email, by mail, toll free phone, and onsite meetings. Borrowers may review account information, make payments and learn about deferments, forbearances, and payment plan options from our web site. Additionally, a borrower may call

---

[5] *Welcome*, Nelnet (last visited, Jun. 28, 2017), https://www.nelnet.com/welcome.

[6] *Help*, Great Lakes (last visited, Jun. 28, 2017), https://www.mygreatlakes.org/educate/help.html.

[7] *About*, MOHELA (last visited, Jun. 28, 2017), https://schools.mohela.com/about.aspx.

our customer service department and ask questions about repayment in order to make the best decisions about managing their student loans."[8]

11.     Navient has also frequently encouraged borrowers to contact it for help with student loan repayment and offered assistance in choosing an appropriate repayment plan. Navient has made numerous statements indicating it will help borrowers choose the most appropriate repayment options for their circumstances, including on its website which states: "[I]f you're having trouble, there are options for assistance, including income-driven repayment plans, deferment, forbearance, and solutions to help you avoid delinquency and prevent default … We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules.  Contact us at 800-722-1300 and let us help you make the right decision for your situation."[9]

12.     Despite these promises, the Consumer Financial Protection Bureau has alleged that Navient utterly failed to provide borrowers with adequate assistance in choosing repayment options.  Instead, the CFPB has asserted that Navient directed borrowers towards repayment options that were easy for Navient to manage but costly for borrowers.

13.     IDR can be a complicated system to service.  First, servicers must explain IDR to borrowers, many of whom are unaware that monthly payments can be tied to their income. Education, as Navient has acknowledged, is crucial.  IDR is not a single repayment option, but encompasses numerous similar options, including: Pay As You Earn ("PAYE"), Revised Pay As You Earn ("REPAYE"), Income-Based Repayment ("IBR"), Income-Contingent Repayment ("ICR"), and more.  Second, servicers must determine the borrowers' eligibility for some or all

---

[8] *Help*, OSLA (last visited, Jun. 28, 2017),  https://public2.osla.org/help.aspx

[9] Navient, If You're Having Trouble, (last visited, Jun. 28, 2017), https://www.navient.com/loan-customers/postponing-payments/if-you-are-having-trouble/.

of the program based on their annual income. Based on their eligibilities, borrowers need to then select the most appropriate repayment program. Finally, borrowers must apply for the selected repayment program with the Student Aid Office of the U.S. Department to Education. Applications require additional documented information. Once a borrower is on an IDR plan, the borrower must submit annual documentation demonstrating continued eligibility for the plans. This means servicers must proactively work with borrowers to explain the IDR plans, determine the eligibility of the borrower, assist in applying to the IDR plan, and then, provide annual renewal notices ensuring the borrower's loan retains its IDR status.

14.     Rather than helping borrowers navigate the complex federal student loan repayment system – as Navient promised and advertised – Navient instead pushed borrowers into forbearance. Unlike IDR, for servicers, forbearance is quick and easy. Navient can place borrowers into forbearance on their own volition and can choose when a borrower's financial circumstances warrant forbearance.

15.     Navient's forced-forbearance approach allowed it to skimp on the number of customer service representatives it hired and reduce the lengths of average call times. In fact, Navient directly incentivized its customer sale representatives to spend as little time as possible on the phone with borrowers by rewarding employees with bonuses for short call times. Motivated to shorten their calls, Navient customer sales representatives often skipped the lengthy discussions about IDR. With less customer service personnel required, Navient saved on expenses.

16.     Although Navient publically proclaimed it would assist borrowers with their repayment options, Navient implemented a customer service model that encouraged and

rewarded the opposite.  Navient saved money by curbing its customer service personnel, but its approach devastated borrowers experiencing financial distress.

17.      By ignoring IDR plans and pushing borrowers into forbearance, Navient offered a temporary solution that ultimately aggravated the underlying issue, borrowers unable to meet their monthly loan payment.  As borrowers sat in forbearance, their interest continued to compound the principal amount of the loan.  These borrowers would have been better served by applying for an IDR program.

18.      As this Complaint will make clear, Navient has proclaimed the need for student loan servicers to educate and assist borrowers, but has implemented a self-interested approach that hurts borrowers.  One borrower harmed by Navient's force forbearance approach brings this suit on behalf of the many similarly harmed borrowers to recover the damages they suffered.

## JURISDICTION AND VENUE

19.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Plaintiff, being a resident of the State of New York, is diverse from Defendants, both of which are headquartered and incorporated in Delaware.  Plaintiff alleges that, in the aggregate, the claims of all Class members exceed $5,000,000, exclusive of interest and costs.

20.      This Court has personal jurisdiction over Defendants because Defendants have established minimum contacts with New York including through mailings, billings, and other communications, and advertisements of its services, and Plaintiff's claim arises out of Defendants' contacts with New York.

21.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(b) because, as Plaintiff is, and at all relevant times was, a resident of New York residing in the Eastern District, a substantial part of the events and omissions giving rise to Plaintiffs claims occurred in Eastern District of New York.

## PARTIES

22.     **Plaintiff** Marie Travis is, and at all relevant times was, a resident of the State of New York.  Plaintiff obtained two direct federal student loans and a private loan from Sallie Mae to cover the expenses of her college education at Briarcliffe College.  Both of her student loans were managed by Navient, to whom her loans were automatically assigned by the U.S. Department of Education.  After nearly ten years of continuous and timely monthly payments, Plaintiff was diagnosed with a devastating auto-immune disorder, preventing her from working and subjecting her to disability.

23.     While on disability, Navient, having succeeded Sallie Mae as Plaintiff's federal loan servicer, encouraged Plaintiff to put her loans into forbearance.  Although Plaintiff's reduced income – stemming only from disability benefits – was potentially long-term, Navient told Plaintiff she must either pay the entire monthly payment or enter into forbearance.  Navient never informed Plaintiff of IDR plans, determined whether IDR was appropriate given her financial situation, or assessed her eligibility for IDR.

24.     **Defendant** Navient Solutions, Inc., is a wholly owned subsidiary of Navient Corporation, and was previously known as Sallie Mae, Inc.  Navient Solutions, Inc. engages in the servicing of both federal and private student loans for more than 12 million borrowers, accounting for $300 billion in owed student loans.

25.     **Defendant** Navient Corporation is a Delaware corporation with its principal place of business at 123 S. Justison Street, Wilmington, Delaware, 19801.  Navient Corporation is a loan management, servicing, and asset recovery company.

26.     Following a corporate reorganization in 2014, Navient Corporation became the successor to Sallie Mae, Inc.  Originally, Sallie Mae was awarded a servicing contract with the U.S. Department of Education in 2009.  That contract remains in effect today, subject to later modifications.  All documents related to that original servicing contract were signed in the name of Sallie Mae or, subsequently, Navient, LLC.

27.     During the corporate reorganization, Navient Corporation assumed certain liabilities related to the servicing and collection activities of Sallie Mae, Inc. and Navient, LLC, and their subsidiaries.  Among the liabilities assumed by Navient Corporation were all of the pre-reorganization servicing and collection conduct described in this Complaint.  As a result of the 2014 corporate reorganization, Navient Corporation is currently the entity that contracts with the U.S. Department of Education for the servicing of federal student loans.

28.     Navient Corporation is also the direct or indirect owner of all of the stock of Navient Solutions, Inc.  Navient Corporation's significant control of Navient Solutions, Inc. suggests it has consented to, has knowledge of, has materially participated in, and/or has controlled the activities of Navient Solutions, Inc. with respect to the conduct alleged in this Complaint.

29.     Navient Corporation owns or leases the offices used by Navient Solutions, Inc., has responsibility for the hiring of employees for Navient Solutions, Inc., and manages all compliance auditing for Navient Solutions, Inc.

30.     The corporate governance and management of Navient Corporation and Navient Solutions, Inc. demonstrates significant overlap.  For example, several directors and officers of Navient Corporation are also directors or officers of Navient Solutions, Inc., including: Jack Remondi (President and Chief Executive Officer for both Navient Corporation and Navient Solutions, Inc.), John Kane (Chief Operating Officer for both Navient Corporation and Navient Solutions, Inc.), Somsak Chivavibul (Chief Financial Officer for both Navient Corporation and Navient Solutions, Inc.), Timothy Hynes (Chief Risk Officer for both Navient Corporation and Navient Solutions, Inc.),  and Stephen O'Connell (Senior Vice President and Treasurer for both Navient Corporation and Navient Solutions, Inc.).

31.      In public statements, including annual 10-K filings with the U.S. Securities and Exchange Commission, Navient Corporation (and its predecessor Sallie Mae) has boasted about its capabilities with respect to student loan servicing and collection, including help to consumers navigating the path towards financial success and selecting the appropriate payment plan for their circumstances.  Navient Corporation has also indicated that it is responsible for overseeing the strategic direction and business goals of its subsidiaries, which includes Navient Solutions, Inc.  For instance, Navient Corporation's 2015 10-K filing includes the following statements:

   a.  "Navient [Corporation] services loans for more than 12 million … customers, including 6.3 million customers whose accounts are serviced under Navient [Corporation]'s contract with [the Education Department].  We help our customers navigate the path to financial success through proactive outreach and emphasis on identifying the payment plan that best fits their individual budgets and financial goals."[10]

_____

[10] CFPB Complaint, at ¶ 23.

b. "The Navient [Corporation] board of directors and its standing committees oversee our strategic direction, including setting our risk management philosophy, tolerance and parameters; and establishing procedures for assessing the risks our businesses face as well as the risk management practices our management team develops and implements."[11]

c. "Each business area within our organization is primarily responsible for managing its specific risks following processes and procedures developed in collaboration with our executive management team and internal risk management partners."[12]

32.    Navient Solutions, Inc., and its predecessor Sallie Mae have a long history of questionable practices as loan servicers and loan providers:[13]

a. In 2014, Navient paid $60 million to settle an investigation by the Justice Department and the Federal Deposit Insurance Corporation, alleging that the company had been wrongly overcharging military families for almost a decade.

b. In 2009, the Education Department investigated Sallie Mae, Navient's predecessor, for overcharging the government by $22.3 million by abusing a program meant for small lending.

c. In 2008, the Federal Deposit Insurance Corporation and the Utah Department of Financial Institutions issued a cease-and-desist order against Sallie Mae Bank, a subsidiary of Sallie Mae, for unfair and deceptive practices and violating laws intended to protect borrowers from discrimination.

---

[11] *Id.*

[12] *Id.*

[13] Gretchen Morgenson, *At Student Loan Giant Navient, Troubled Past Was Prologue*, NY Times (Jan. 21, 2017), https://www.nytimes.com/2017/01/21/business/navient-sallie-mae-student-loans.html

33.     This Complaint, along with Complaints filed by the Illinois Attorney General[14], Washington Attorney General[15], and the Consumer Financial Protection Bureau ("CFPB")[16] is another in the line of those alleging Navient's mismanagement.   In addition, the Attorneys General of twenty-two states recently wrote a letter to Betsy DeVos, Secretary of the Department of Educations, raising concerns about Navient's "widespread abuses of student borrowers."[17]

## FACTS

### The Student Loan Crisis

34.     Completing a four-year degree at a college or university is becoming increasingly necessary to compete for well-paying jobs in the current economy.

35.     As of 2013, employees between the ages of 25 and 32 with at least a Bachelor's degree received an average annual salary of $45,000, around $15,000 more per year than employees who received only a two-year degree (averaging $30,000 per year) or graduated from high school (averaging $28,000 per year).[18]

---

[14] *See* Complaint filed by the Illinois Attorney General, 17-CH-0761, ECF 1 (Ill. Cir. Ct. Mar 23, 2017) [hereinafter, "Illinois AG Complaint"].

[15] *See* Complaint filed by the Washington Attorney General, (Wash. Dist. Ct. Mar 23, 2017) [hereinafter, "Washington AG Complaint"].

[16] *See* Complaint filed by CFPB, 17-cv-0101, ECF 1 at 10 (M.D. Pa., Jan. 18, 2017) [hereinafter, "CFPB Complaint"].

17 Letter to Betsy DeVos, Secretary of the Department of Education, from Maura Healey, Massachusetts Attorney General, et al., Re: Revocation of Student Loan Borrower Protections (Apr. 24, 2017), http://www.mass.gov/ago/docs/press/2017/multistate-letter-to-sec-devos.pdf.

[18] *The 7 Benefits of Going to College*, ED Smart (last visited, Jun. 28, 2017), http://www.edsmart.org/7-benefits-of-college-degree/

36.     Since 1979, the average annual salaries of employees with only a two-year degree or a high school education has *decreased* by approximately $5,000 and $4,000 respectively, while the value of four year degree has increased by almost $5,000 per year.[19]

37.     While the benefit of a four year degree has increased, so has the cost of obtaining one.

38.     The average yearly tuition for a four-year institution has more than doubled since 1984-85, rising from approximately $11,548 to $25,409 in 2014-15.  From 2004-05 to 2014-15 alone, yearly tuition rates for four-year public institutions increased over 33 percent.[20]  In 2015-16, average tuition and fees at a public four-year college or university – which is, on average, the least expensive type of four-year institution – had increased by 13 percent from 2010-2011, a significantly higher increase than inflation or wage growth in the same period.[21]

39.     With rising tuition costs, "[f]inancial aid has become a fundamental expectation of students and institutions."[22]  Since 2005, the number of student loan borrowers has almost doubled, from 23 million to approximately 44 million.[23]  By 2012, nearly 75% of all students

---

[19] *Id.*

[20] *Fast Facts: Tuition Costs of Colleges and Universities*, NCES (last visited, Jun. 28, 2017), https://nces.ed.gov/fastfacts/display.asp?id=76

[21] Lusardi, Annamaria, et al., *Student Loan Debt in the US: An Analysis of the 2015 NFCS Data*, GFLEC (Nov 2016), http://gflec.org/wp-content/uploads/2016/11/GFLEC-Brief-Student-loan-debt.pdf

[22] Matthew B. Fuller, A History of Financial Aid to Students, 44 J. Student Fin. Aid 42, 42 (2014).

23 Fawn Johnson, Taking on the Student Loan System, Atlantic (May 15, 2014), https://www.theatlantic.com/politics/archive/2014/05/taking-on-the-student-loan-system/430938/

graduating from a four-year institution graduated with student loan debt—translating to 1.3 million students, up from 1.1 million in 2008 and 0.9 million in 2004.[24]

40.    Simply put, most current and future students could not afford the cost of obtaining a four year degree without receiving public and/or private student loans.

41.    As the cost of obtaining a four year degree has skyrocketed, student loan debt has spiraled out of control.  In all, nearly half of Americans starting their working lives do so with student debt resulting in more than double the number of Americans with student debt from a decade ago.[25]

42.    Federal Student Aid reports the average debt for a single year of college is $6,707 and, by the completion of a four-year degree, students average $26,830 in debt.[26]  For non-public schools, the numbers are more concerning.  In 2012, 75 percent of graduates from private non-profit schools had student loan debt with an average indebtedness of $32,300 per person.  By comparison, 88 percent of graduates from for-profit colleges took out student loans with an average indebtedness of $39,950 per person.[27]

43.    Student loan indebtedness affects more than just young workers and recent graduates.  In 2015, older consumers often looking to cover the substantial costs of student loans for their children or grandchildren owed an estimated $66.7 billion in student loans.[28]  In fact, the

---

[24] *Quick Facts About Student Debt*, Institute for College Access & Success (2014), http://ticas.org/sites/default/files/pub_files/Debt_Facts_and_Sources.pdf.

[25] Press Release, Study finds 1 in 3 student loan holders with payments due are late with payment, FINRA (Nov. 14, 2016) .

[26] *Entrance Counseling*, Federal Student Aid (last visited, Jan. 28, 2017), https://studentloans.gov/myDirectLoan/entranceCounseling.action?execution=e1s1.

[27] Student Loan Debt Statistics, *supra* note 3.

[28] *Snapshot of Older Consumers and Student Loan Debt*, CFPB at 2 (Jan. 2017).

number of consumers age 60 and older with outstanding student loan debt has quadrupled since 2005, growing from 700,000 to 2.8 million borrowers and cosigners.[29]

44.     The rising costs of tuition and growing student loan debt has led to staggering milestones for overall student loan debt in the United States.  Student loan debt has been one of the fastest growing forms of debt over the past decade.  In 2010, student loan debt exceeded credit card debt and, by 2011, student loan debt had surpassed auto loan debt making student loan debt the second largest debt market in the United States.  In 2012, student loan debt passed the $1 trillion mark and continues to grow.[30]

45.     In all, approximately 44 million student loan borrowers currently owe around $1.4 trillion in student debt.

46.     The significant number of borrowers in debt and the substantial amount of debt owed has predictably caused complications for some borrowers in loan repayment.  A staggering 37% of student loan holders have reported being late on a student loan payment at least once in the past 12 months, and about half of student loan holders are concerned about their ability to pay off their student debt.[31]

47.     The Consumer Federation of America similarly found that millions of borrowers failed to make a loan payment for at least nine months or more in 2016 on debt worth $137 billion in federal student loans.  Similarly, in September 2014, around one in seven borrowers had defaulted on their loans within 3 years of starting repayment, which amounted to $103

---

[29] *Id.* at 4.

[30] Mark Kantrowitz, *Why the Student Loan Crisis is Even Worse than People Think*, CNN Money (Jan 11, 2016).

[31] Study finds 1 in 3 Students Late, *supra* note 25.

billion worth of debt.[32]  These numbers indicate about 10 percent of debt is regularly in default and not being paid back.

48.    Both younger and older borrowers have experienced increased delinquency rates on their student loans.  The student loan delinquency rate, defined as loans in delinquent or default for 90 days or more, on student loans is at an estimated 11.2 percent.[33]  Like younger borrowers, older borrowers have seen increasing delinquency rates rise from 7.4 percent in 2005 to 12.5 percent in 2012.[34]  Incredibly, nearly 40 percent of federal student loan borrowers age 65 and older are in default.[35]

49.    Although the number of defaults and repayment concerns, the federal government has adopted a litany of repayment programs specifically designed to adjust repayment based on income and permit borrowers to consistently make affordable payments on their loans.

### Federal Student Loans and Repayment Options

50.    The federal government has prioritized financial assistance to students for higher education since 1965, when Congress passed the Higher Education Act, Title IV.  The Act has experienced significant modifications since then, but the objective remains the same: provide a competitive advantage in the global economy by creating a highly-skilled work force and ensure that low-income, middle-income, and minorities have access to quality higher education.

51.    Until 1994, the federal student loans were almost entirely funded by private lenders, with funds insured by guaranty agencies and in turn, reinsured by the federal government.  However, in 1994, President Clinton signed the Student Loan Reform Act which

---

[32] *Federal Student Loans Education Could Do More to Help Ensure Borrowers Are Aware of Repayment and Forgiveness Options*, Gov't Accountability Office (Aug. 2015).

[33] Student Loan Debt Statistics, *supra* note 3.

[34] *Snapshot of Older Consumers and Student Loan Debt*, *supra* note 28, at 11.

[35] *Id.*

sought to convert 60 percent of federally guaranteed student loans to direct loans – loans the federal government provided directly to borrowers – over a five year period.[36]

52.     The transition from private loans to direct federal loans was completed by the passage of the Health Care and Education Reconciliation Act in 2010.  The 2010 Act eliminated the Federal Family Education Loan Program – through which, the Federal Government backed private student loans – and replaced it with the Direct Student Loan Program – whereby the federal government provides direct student loans.  Today, a majority of student loans are Direct Loans offered by the federal government.

53.     For borrowers, federal student loans have significant benefits as compared to private loans, including:

    a.  Deferment.  Federal loans often require borrowers to make no payments until the borrower has graduated or left full-time student status while private loans may require payments while the borrower is still in school.[37]

    b.  Interest rates.  Federal loans often have lower and fixed interest rates while private loans often have variable interest rates that can exceed 18 percent.

    c.  Subsidized loans.  Some students qualify for subsidized loans through which the government pays the interest on the loan while the borrower is in school which is unavailable for private loans.

    d.  Credit and Cosigners.  Federal loans often do not examine borrowers' credit scores or require cosigners to obtain a loan while private loans may require established credit and often require a cosigner.

---

[36] Fuller, *supra* note 22, at 57.

[37] *Federal Versus Private Loans*, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/types/loans/federal-vs-private

    e.   Tax deductible interest.  Interest on federal student loans may be tax deductible which is not usually available for private student loans.

    f.   Consolidation.  The federal government offers a Direct Consolidation Loan which permits borrowers to consolidate all of their federal loans into a single, low interest loan.

    g.   Income-Driven Repayment Options.  The Federal Government provides numerous repayment options that adjust to borrowers' incomes and provide relief in both temporary and long-term financial distress.

54.    After the passage of the Healthcare and Education Reconciliation Act of 2010, the federal government has become by far the most prominent source of student aid.  The Federal Government has amassed $1.291 trillion in debt spread across 42.3 million borrowers, accounting for over 90 percent of all student debt.[38]

55.    To service its direct federal student loans, the U.S. Department of Education contracts with financial companies, including Navient, to provide "any potential services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt."[39]

56.    The Federal government heavily relies on servicers to educate borrowers about their repayment options and, where appropriate, offer individual assessments of borrowers' financial circumstances to determine the best repayment options.  While federal student loan borrowers are usually assigned to or select a specific repayment plan at the start of repayment, repayment plans are not locked-in.  Rather, borrowers can alter their repayment plans depending on their financial circumstances.

---

[38] *A Look at the Shocking Student Loan Debt Statistics for 2017supra* note 3.

[39] *See* Servicing Contract, CFPB Complaint, ECF 29-1.

57.     Repayment options include a standard repayment plan where payments are fixed for a ten year period, graduated repayment plans where payments increase over time, extended repayment plans which last twenty-five years rather than ten years, Pay as You Earn Repayment (PAYE) and Revised Pay As You Earn (REPAYE) where monthly payments are limited to ten percent of a borrower's discretionary income, and Income-Driven Repayment plans where monthly payments are calculated as a percentage of discretionary or annual income.[40]

58.     Income-Driven Repayment ("IDR") plans, including PAYE and income-based repayment, are repayment plans specifically designed to help borrowers manage their student loan debt and continue to make affordable payments, even when a borrower is experiencing financial hardship or distress.  Borrowers with a high debt relative to income and who are unable to make monthly payments at the ten-year standard plan amount may qualify for an IDR plan. For those borrowers, IDR permits monthly payments of 10-15 percent of discretionary income, recalculated each year based on updated income and family size.  Some borrowers are eligible to pay $0 per month on an IDR plan.

59.     IDR plans are designed for borrowers experiencing long-term financial hardship. For borrowers with subsidized loans (student loans for which the government pays off any interest), the government will pay any remaining unpaid interest that accrues after the borrower's monthly payment through the IDR plan for the first three years of repayment.  Thus, while the borrower is making his or her IDR plan payments, excess interest is not added to the principal balance of the loan, reducing the amount repaid over the life of the loan.

---

[40] *Repayment Plans*, Federal Student Aid (last visited, Jun. 28, 2017),
https://studentaid.ed.gov/sa/repay-loans/understand/plans

60.     Additionally, after 20 to 25 years of monthly IDR plan payments, any outstanding balance on the loan will be forgiven.[41]

61.     Federal student loans also generally offer options for student loan borrowers temporarily struggling to pay their monthly student loan payment.  For example, forbearance allows borrowers to temporarily stop making their student loan payments, avoiding default.  The federal Student Aid Office advises that forbearance is available for borrowers "struggling to repay . . . loans due to a temporary circumstance."  Forbearance is appropriate for borrowers who are "temporarily unable to make . . . scheduled monthly loan payments" because of "financial difficulties[,] medical expenses[,] change in employment[, or] other reasons acceptable to your loan servicer[.]"[42]

62.     Over the long-term, however, forbearance can negatively affect borrowers' student loan accounts.  While a student loan is in forbearance, unpaid interest accumulates and is added to the principal balance of the loan.  The higher principal can increase the amount of monthly interest and, eventually, lead to higher monthly loan payments when forbearance is ended.  Forbearance continued over a long period of time may significantly increase the principal balance on the loan.

63.     For that reason, the Student Aid Office recommends that borrowers "having trouble repaying . . . loans due to circumstances that may continue for an extended period, or [who are] unsure when [they] will be able to afford to make . . . monthly loan payments again . . . consider an income-driven repayment plan."  The Student Aid Office recommends borrowers contact their "servicer immediately" to discuss their options.

---

[41] *Income-Driven Plans*, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

[42] *Deferment or Forbearance*, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/deferment-forbearance

64. The application process for IDR programs and forbearance differ significantly. Federal loan servicers are permitted to determine when a borrower may be entered into forbearance and does not need prior approval from the Student Aid Office.

65. IDR, by contrast, is available only for eligible borrowers who must apply with the Student Aid Office and submit documentation supporting the borrower's eligibility for IDR programs.

66. Given the complexity and variety of IDR programs, the Student Aid Office encourages borrowers to work with their loan servicers to learn about, determine eligibility, and apply for IDR programs:

    a. "Why pay for help with your federal student loans when your loan servicer will help you for FREE? Contact your servicer to apply for income-driven repayment plans, student loan forgiveness, and more."[43]

    b. "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you."[44]

    c. "To apply, you must submit an application called the Income-Driven Repayment Plan Request . . . The application allows you to select an income-driven repayment plan by name, or to request that your loan servicer determine what income-driven plan or plans you qualify for, and to place you on the income-driven plan with the lowest monthly payment amount."[45]

---

[43] *Income-Driven Plans*, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

[44] *Id.*

[45] *Id.*

67.     The forms borrowers must complete to apply for IDR plans also informs borrowers to discuss IDR plan options with their loan servicer: "If you need help with this form, contact your loan holder or servicer for free assistance."[46]

68.     Making servicers available to borrowers to discuss IDR repayment options is an important objective for the federal government because some organizations will offer these services for a fee.  For example, the Student Aid Office website informs borrowers "You Don't Have To Pay for Help With Your Student Loans[,]" directing borrowers to "take care of yourself for free by contacting your loan servicer" for help with a variety of services including, to "[c]hange your repayment plan" and "postpone monthly payments while you're furthering your education or are unemployed."[47]

69.     Loan servicers contracting with the federal government likewise warn borrowers about paying for services they provide without a fee.  Navient's website warns borrowers to "Beware of Offers for Debt Relief" where "companies claim they can reduce or eliminate your debt, but they charge for services we offer for free."[48]  Nelnet, another loan servicer, states in bold: "Never Pay for Student Loan Help.  It's Available for Free from Your Student Loan Servicer!"[49]  Great Lakes, also a loan servicer, advises borrowers "Don't Pay a Fee for Student Loan Help That's Free."[50]  When loan servicers fail to provide the free assistance they offer and

---

[46] A copy of the Income-Driven Repayment (IDR) Plan Request form can be found at: https://static.studentloans.gov/images/idrPreview.pdf

[47] *Avoid Scams*, Federal Student Aid (last visited, Jun. 28, 2017), https://studentaid.ed.gov/sa/types/scams#dont-pay-for-help

[48] *Loan Customers*, Navient (last visited, Jun. 28, 2017),  https://www.navient.com/loan-customers/

[49] *Never Pay for Student Loan Help*, Nelnet (last visited, Jun. 28, 2017), https://www.nelnet.com/third-party-servicer-fraud

[50] *Free Help*, Great Lakes (last visited, Jun. 28, 2017), https://www.mygreatlakes.org/educate/knowledge-center/free-services.html

the federal government asserts they provide, borrowers are at an increased risk of falling into third-party fee-based services and possibly fraudulent scams intended to take advantage of the vulnerable class of financially-stressed borrowers.[51]

### *Navient, a Federal Student Loan Servicer*

70.     Navient is the nation's largest student loan servicer, handling more than 1 in 4 accounts[52] related to loans for higher education including servicing Department of Education student loans.  Navient bills itself as a "loan management, servicing and asset recovery company, committed to helping customers navigate the path to financial success."  Navient "services loans for more than 12 million . . . customers, including 6.3 million customers whose accounts are serviced under Navient [Corporation]'s contract with [the Department of Education]."

71.     Navient claims to "help [their] customers navigate the path to financial success through proactive outreach and emphasis on identifying the payment plan that best fits their individual budgets and financial goals."[53]  Navient, at least publically, proclaims the important role of servicers as educators and advisors available to assist borrowers in understanding and applying for repayment plans:

---

[51] *See, e.g.*, Kevin McCoy, *Feds Halt Alleged Student Loan Debt Relief Scam*, USA Today (May 25, 2017),  https://www.usatoday.com/story/money/2017/05/25/feds-halt-alleged-student-loan-debt-relief-scam/102144638/ & Herb Weisbaum, *As Student Loan Defaults increase, So Do the Scams,* NBC News (Sep. 19, 2016), http://www.nbcnews.com/business/consumer/student-loan-defaults-increase-so-do-scams-n650466

[52] Shahien Nasiripour & Janet Lorin, *Behind the Dizzying Student Loan Game Navient Allegedly Played*, Bloomberg (Jan. 26, 2017), https://www.bloomberg.com/news/articles/2017-01-26/behind-the-dizzying-student-loan-game-navient-allegedly-played.

[53] *See* CFPB Complaint at ¶ 10.

a.   "For some borrowers, student loan debt can be especially daunting.  The good news is that borrowers can turn to their student loan servicers for help to navigate the complex repayment options."[54]

b.   "A recent analysis of the top factors of student loan success showed that borrowers who stay connected with their servicer are more likely to make progress in loan repayment. As a servicer, we've found that nine times out of 10, when we reach struggling federal loan borrowers we are able to help them avoid default by getting them into a repayment plan that works for them. Contact works; let's encourage it."[55]

c.   "Making your student loan payments is an important part of managing your finances, but there may be life circumstances that make it difficult to meet these obligations.  It is good to know that your loan servicer may be able to offer you options designed to help you stay current on your loan payments, in a way that works for you financially . . . To explore different types of repayment plans and the option that best fits your needs, you can . . . call your loan servicer."[56]

d.   "Struggling federal borrowers who engage with their servicers will learn about the options to repay student loans in a way that best fits their individual circumstances.  Income-driven repayment programs such as Pay As You Earn and

---

[54] Jack Remondi, *4 Ideas For a Better Student Loan Program*, Medium (Feb. 12, 2017), https://medium.com/@JackRemondi/4-ideas-for-a-better-student-loan-program-a-common-sense-recipe-for-reform-521e651d612

[55] Jack Remondi, *Smarter Student Loans: A Game Plan* (Oct. 6, 2015), http://www.politico.com/agenda/story/2015/10/smarter-student-loans-a-game-plan-000267

[56] Video, *Choosing Your Repayment Plan*, Navient (last visited, Jun. 28, 2017), https://www.navientpath.com/navientpath/curriculum/show?enrollment_id=15802651&part=1&signup=1#navient-income-driven-repayment/choosing-your-repayment-plans

Income-Based Repayment establish a monthly payment based on a percentage of discretionary income that can make short- or long-term financial challenges much more manageable."[57]

72. Navient was also well aware of the importance of servicers in helping borrowers make timely payments and adjust repayment plans accordingly. For example, Navient CEO Jack Remondi explained: "Under the Obama Administration, enrollment in [income-based repayment] programs has increased dramatically, and today one in four borrowers is in an IDR plan. Despite this success, the proliferation of plan options and increasing complexity in the system has created barriers for borrowers who could benefit from these programs."[58]

73. Remondi has also indicated the four most important areas in need of improvement to benefit student loan borrowers are "Educating borrowers[,]" "Simplifying repayment[,]" "Helping borrowers pay off early rather than delay[,]" and "Encouraging borrowers to engage with their loan services."[59]

74. Navient's own research proffered further evidence that borrowers rely on servicers to provide information about and assist borrowers with IDR repayment options. In 2015, Navient implemented an "education campaign on income-based repayment, and developed

---

[57] Jack Remondi, *It's Time to Put Students First*, Medium (May 23, 2016), https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e)

[58] Jack Remondi, 56 Federal Student Loan Repayment Options? We Can and Should Do Better, Medium (Oct. 12, 2016), https://medium.com/@JackRemondi/56-federal-student-loan-repayment-options-we-can-and-should-simplify-1e8cb6ebc82a)

[59] Jack Remondi, *Smarter Student Loans: A Game Plan*, Politico (Oct. 6, 2015), http://www.politico.com/agenda/story/2015/10/smarter-student-loans-a-game-plan-000267

research-based communications to assist customers facing financial difficulty."[60]  As part of that

campaign, Navient conducted a survey of borrowers enrolled in IDR and PAYE plans.[61]

76.     Significantly, in response to a question about "[w]hat is needed to make [a]

decision on future plans for IDR, 55 percent of survey takers stated they needed "[i]nformation

on how [IDR] impacts my total loan cost" and 65 percent stated they needed "[a]dvice on

whether this is the right type of plan for me."  More than half of survey takers "agreed with the

statement that repayment plan options for student loans are very confusing."[63]

77.     Navient even successfully identified short-cut identifiers for borrowers who may

be eligible for IDR.  For example, 75% of IDR-enrolled borrowers made less than $50,000

annually with nearly half of borrowers in IDR plans making less than $35,000.  Similarly, almost

90 percent of enrollees were working full time; 90 percent successfully completed their degrees;

40 percent attended graduate school and obtained a graduate degree; and half were younger than

34 years old.[64]

78.     Navient's repeated findings concerning the substantial benefit that IDR provides

borrowers facing financial difficulty and borrowers' overall lack of awareness and understanding

---

[60] Press Release, *Navient Debuts Services to 12 Million Student Loan Customers*, Globe Newswire (Oct. 13, 2014), http://news.navient.com/releasedetail.cfm?releaseid=875837

[61] *Income-Driven Repayment and Student Loan Affordability*, Navient (2015), https://www.navient.com/assets/about/who-we-are/Income-Driven-Repayment-and-Student-Loan-Affordability-Study.pdf.

[62] *Id.* at 5.

[63] *Id.* at 6.

[64] *Id.* at 2.

of IDR plans prompted Navient to consistently encourage borrowers to contact it for IDR-related assistance:

    a.   "[Navient is] committed to giving you the information and tools you need to understand and evaluate your student loan payment options.  We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost."[65]

    b.   "[I]f you're having trouble, there are options for assistance, including income-driven repayment plans, deferment, forbearance, and solutions to help you avoid delinquency and prevent default . . . We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules. Contact us at 800-722-1300 and let us help you make the right decision for your situation."[66]

    c.   "If you're experiencing problems making your loan payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation."[67]

    d.   "Navient is here to help. We've found that, 9 times out of 10, when we can talk to a struggling federal loan customer we can help him or her get on an affordable payment plan and avoid default."[68]

    e.   "If [y]ou're [h]aving [t]rouble . . . [l]ook for alternative repayment options. Contact Navient and your other loan services.  We can work with you to help you

---

[65] CFPB Complaint at ¶ 39.

[66] *Id.* at ¶ 38.

[67] *Id.*

[68] *Id.*

get back on track, and are sometimes able to offer new or temporarily reduced payment schedules.  Contact us . . . and let us help you make the right decision for your situation."[69]

f.   "At Navient, we make it a priority to educate our federal borrowers about income-driven options, with more than 170 million communications annually about repayment options. These programs are our primary tool in helping borrowers avoid default. As a result, we are a leader in enrolling borrowers in these programs."[70]

g.   "At Navient, we use our experience and data to create highly effective tools that assist our customers as they navigate the path to repayment."[71]

79.    Navient describes its federal student loan servicing practice as: "help[ing] . . . customers successfully pay their education loans and build their credit . . . [using] financial literacy tools and in-depth customer service" and achieving "positive results in keeping borrowers on the path to successful repayment."[72]

80.    Although Navient advertises its ability to assist borrowers with loan repayment and delinquency avoidance, it is also Navient's responsibility to do so.  According to the Servicing Agreement Navient signed with the Department of Education, Navient is responsible for "any potential services to manage all types of Title IV student aid obligations, including, but

---

[69] *If You're Having Trouble*, Navient (last visited, Jun. 28, 2017), https://www.navient.com/loan-customers/postponing-payments/if-you-are-having-trouble/.

[70] Jack Remondi, *It's Time To Put Students First*, Medium (May 23, 2016), https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e

[71] Stephanie Eidelman, *Navient CEO Shares Rarely Heard Stores about Student Debt Payment*, Inside Arm (May 31, 2016), https://www.insidearm.com/news/00041966-navient-ceo-shares-rarely-heard-stories-a/.

[72] *Services*, Navient (last visited, Jun. 28, 2017), https://www.navient.com/about/who-we-are/services/

not limited to, servicing and consolidation of outstanding debt" and must provide "default aversion activity on loans serviced . . . on the servicer's system."

81.     The Department of Education also informs borrowers through the Master Promissory Note ("MPN") of the responsibility of servicers.  The MPN is a "legal document in which [the borrower] promise[s] to repay [the borrowers] loan(s) and any accrued interest and fees to the U.S. Department of Education.  It also explains the terms and conditions of [the borrowers] loan(s)."  Borrowers must attest that they "understand that ED may use a servicer to handle billing and other communications related to the[] loan."

82.     In 2014, the MPN informed borrowers that "Direct Loans are made by the U.S. Department of Education.  We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans."  The 2011 and 2014 versions of the MPN both provide information about the types of repayment plans, including IDR plans.  The MPNs state "You may change repayment plans at any time after you have begun repaying your loan.  There is no penalty if you make loan payments before they are due, or pay more than the amount due each month."  The Department of Education encourages borrowers to contact their servicers about these issues: "We will provide you with the address and telephone number of the Loan Servicing Center after your school notifies us that the first disbursement of your loan has been made."

83.     The Education Department has prioritized educating borrowers about IDR plans. The Department found 51 percent of Direct Loan borrowers were eligible for Income-Based Repayment but, by 2014, only 13 percent were participating with an additional 2 percent in PAYE plans.[73]    The Department also found deficiencies in borrowers' awareness and

---

[73] *Federal Student Loans Education Could Do More to Help Ensure Borrowers Are Aware of Repayment and Forgiveness Options*, *supra* note 32.

understanding of these plans and that servicers had constantly failed to educate borrowers about the plans.  Similar studies have shown only one in five students are aware that student loan payments may be adjusted to their income.[74]  By encouraging borrowers to work with their servicers, the Education Department sought to educate about and assist borrowers with IDR plans.

84.    Ensuring borrowers have information on and the ability to choose repayment plans is critical to enabling borrowers to successfully and continuously make payments on their federal student loan accounts.  Navient's own survey of over 12,000 student loan borrowers enrolled in IBR or PAYE led to the conclusion that income-driven repayment programs were "largely serving [their] purpose to provide relief for low-to-moderate-income individuals making the transition from school to repayment."

### Navient Breached Its Obligations to Assist Borrowers in Choosing the Best Repayment Plan

85.    Although Navient has encouraged borrowers to contact it for assistance in choosing the best repayment plan, Navient has not reasonably assisted those borrowers who have reached out for help.  Instead of performing individual analyses to determine IDR eligibility and assist in IDR applications, Navient has persistently steered borrowers towards forbearance, even when borrowers were experiencing the type of long-term financial hardship that continual forbearance *compounds,* and that other programs like IDR and PAYE may benefit.

86.    Navient prefers putting borrowers into forbearance rather than into an IDR plan for one simple reason: making more money for Navient.  As CEO Jack Remondi admitted, "it's very expensive work, for example, to enroll a borrower into something like an income-based

---

[74] Lusardi, Annamaria, *supra* note 21.

repayment program . . . which we are doing.  But we don't actually get paid for outperformance in that side of the equation."[75]

87.    Similarly, Steven McGarry, chief financial officer at Sallie Mae and Senior Vice President of Sallie Mae before Navient was formed through corporate reorganization, said in January 2017: "Student loan servicing is a low-margin, high-volume business: It doesn't cost much to service an account for a borrower who pays automatically through her bank account. For those who are late on their payments, however, a servicer can rack up expenses that are many, many multiples of the average servicing costs."[76]

88.    To avoid the time and expense of servicing difficult loans, Navient implemented incentives designed to limit the length of conversations about and involvement in assisting borrowers with their repayment options.   Navient compensated its customer service representatives, in part, on the shortness of their average call time.   Such a compensation program discourages customer sales representatives from discussing IDR plans and encourages them simply to place borrowers into forbearance, which takes much less time and expense for the servicer.

89.    Unlike forbearance, IDR and PAYE require additional time and effort for borrowers to apply.   First, borrowers rely on Navient to learn about and obtain information regarding IDR plans as compared to other repayment plans and forbearance; thus, Navient's consumer representatives must commit to lengthy and detailed conversations with borrowers about their repayment options.   Second, more than half of Navient's borrowers enrolling into IDR plans reported they could not navigate the process on their own; meaning, borrowers rely on servicers like Navient to determine eligibility and complete the application process.   Third, to

---

[75] Nasiripour & Lorin, *supra* note 52.

[76] *Id.* (internal quotations omitted).

enroll in IDR, borrowers must complete a paper or online application and must include documents related to their income; Navient's customer representatives must endure sometimes multiple conversations with a borrower to complete this process. Finally, IDR plans require borrowers to complete annual recertification forms each year. In the recertification, borrowers must provide information related to current income and family size, which may lead to adjustments in the monthly payment amount.

90. Forbearance, by contrast, requires no formal application, much less explanation, and no annual recertification forms. Placing a borrower into forbearance is far easier and more efficient for Navient; however, it is rarely the best option for borrowers struggling to make their monthly payments.

91. The effect of Navient's strategy to minimize its servicing of federal student loan borrowers was to essentially force borrowers into forbearance, even when clearly inappropriate given the borrowers' financial circumstances. A review of call records between Navient and federal student loan borrowers by investigators demonstrated that forbearance and deferment were frequently mentioned with the first six minutes of the call, while IDR plans were mentioned far less frequently. In fact, around half the time, Navient employees never mentioned IDR plans at all.[77]

92. One former Navient loan servicing specialist working in Newark, Delaware from 2011-2012 explained the effect of Navient's compensation program. According to her, the maximum call time to receive a bonus was approximately six minutes. Her call times, however, were often about ten minutes because she tried to see if callers qualified for lower payments. She observed other customer service representatives who hung up on customers or had short call

---

[77] Nasiripour & Lorin, *supra* note 52.

times would make bonuses. She states that she often got pulled aside and talked to because of her higher call times.[78] As the former employee explained, Navient's incentive compensation structure incentivized and actually impacted Navient's employee's call times with borrowers, diminishing the quality of service borrowers received.

93.    The following line graph represents a sample of average call times during which Navient mentions income-driven repayment options, deferment, and forbearance with callers.[79] The top line represents the instances in which Navient customer sales representatives mention only deferment or forbearance. The line below represents instances in which Navient's customer sales representatives mention other repayment options, including IDR.



94.    As the graph demonstrates, Navient's customer sales representatives discuss forbearance and deferment at a far greater rate than other repayment options. Between 3 to 6

---

[78] Washington AG Complaint ¶ 5.159.

[79] This graph was created by the Illinois Attorney General's Office, who reviewed phone calls during the course of their investigation of Navient's compensation policies which resulted in shorter call times and failures to explain more complicated repayment programs like IDR. *See* Illinois AG complaint, at ¶¶ 273-77.

minutes, customer sales representatives mention only deferment or forbearance upwards of four times more often than they mention any other repayment options.

95.     The graph further lends credence to the former Navient employee, who stated that bonuses are based on having calls less than approximately six minutes.  Customer sales representatives mention only deferment and/or forbearance at a significantly higher rate before the six minute mark.  After six minutes, the number of calls where customer sales representatives mention only forbearance and/or deferment deceases and the number of calls where customer sales representatives mention other repayment options increases.

96.     Navient's lack of meaningful engagement with student loan borrowers has built up frustration among student loan holders.  From January to March 2017, student loan complaints about Navient made to the CFPB drastically increased.  In comparison to the same period in 2016, complaints were up by 325 percent.  Borrowers further confirmed in the complaints to the CFPB that when contacting Navient regarding financial distress, they were provided information on forbearance or deferment rather than IDR or other repayment options.

97.     Navient has enrolled significantly more borrowers in forbearance than in IDR plans.  For example, in December 2010, approximately 9% of borrowers with a loan through Federal Family Education Loan (FFEL) serviced by Navient were enrolled into voluntary forbearance, while less than 1 percent of borrowers were enrolled in IBR.  Likewise, in December 2012, approximately 7 percent of borrowers with a FFEL loan serviced by Navient were enrolled in voluntary forbearance, while only 2% of borrowers were enrolled in IBR.

98.     Between January 1, 2010 and March 31, 2015, nearly 26 percent of borrowers serviced by Navient who ultimately enrolled in IDR programs with a $0 monthly payment were enrolled in voluntary forbearance within the twelve-month period immediately preceding their

enrollment in IDR.[80]  Within that same period, 16 percent of borrowers who enrolled in PAYE were placed into forbearance within the twelve-month period immediately preceding their PAYE enrollment.[81]

99.     At the same time, Navient enrolled over 1.5 million borrowers nationwide in two or more consecutive forbearances totaling twelve months or longer.  More than 470,000 of these borrowers were enrolled in three consecutive forbearances, and more than 520,000 of them were enrolled in four or more consecutive forbearances.[82]

100.     Many of the borrowers placed in forbearance qualified for an IDR plan.  In fact, over 50 percent of Navient borrowers who need payment relief and meet the eligibility criteria for IDR plans would qualify for a monthly payment of $0.

101.     Navient's unwillingness to engage with struggling borrowers has caused substantial problems for these borrowers, snowballing their debt out of meaningful control, ruining their credit scores and burdening their lives with the risk of financial ruin.  While Navient's forced-forbearance strategy was effective in saving Navient money, it cost borrowers substantially.  Indeed, the CFPB estimates Navient's actions helped increase the total debt by $4 billion.

102.     A recent Reuters investigative piece detailed but a few examples of the borrowers impacted by Navient's practices.[83]

---

[80] Illinois AG Complaint, at ¶ 285.

[81] *Id.* at ¶ 286.

[82] *Id.* at ¶ 290

[83] Michelle Conlin, *Student Loan Borrowers, Herded Into Default, Face a Relentless Collector: The U.S.*, Reuters (July 25, 2017),  https://www.reuters.com/investigates/special-report/usa-studentloans/

103.    While borrowers were driven into forbearance, and ultimately harmed, Navient benefited.  Navient saved considerable time and money by avoiding detailed conversations with borrowers about IDR and PAYE, limiting the number of IDR applications it completed, and reducing the number of borrowers in need of annual reminders and assistance related to recertification forms.  By simply pushing borrowers into forbearance, Navient was able to reduce its customer service personnel and the time and expense of dealing with the "expensive" group borrowers who are struggling to make their payments and in need of IDR programs in which they are entitled to participate by federal law.

104.    Navient has sharply changed its tune now that its strategy has been made public. Despite once boasting about its ability to help borrowers navigate toward repayment success, Navient now claims "[b]orrowers cannot reasonably rely on a loan servicer to serve as a fiduciary" and "could not reasonably rely on Navient to counsel them into alternative payment plans."[84]

105.    Navient has now minimized its role to simply "collect[ing] payments owed by borrowers" because, contrary to their advertisements, "there is no expectation that the servicer will act in the interest of the consumer."[85]

106.    Navient has fully disavowed its role as an educator of and advocate for student loan borrowers.  The federal government's contract with Navient requires Navient to service student loans and serve borrowers' needs.  Navient has instead consistently put its own interests before that of borrowers, causing borrowers to suffer significant and unnecessary financial harm

---

[84] *See* Defendants' Memorandum In Supp. of the Motion to Dismiss CFPB Complaint, 17-cv-0101, ECF 29, at 20.

[85] *Id.* at 20-21.

and distress.   Navient's disinterest in helping borrowers has placed significant numbers of borrowers into positions where they can no longer pay back their student loans.

### *Plaintiff Was Harmed by Navient*

107.    Plaintiff attended Briarcliffe College in Patchogue, New York.   In 2005-2006, Plaintiff applied for and received two federal loans to pay for her tuition, co-signed by her parents.   Both loans were managed by Sallie Mae, and later, Navient.   Over ten years later, Plaintiff is still struggling to pay back her student loans.

108.    In 2016, Plaintiff was diagnosed with a life-threatening syndrome requiring significant medical treatment and subjecting her to disabilities preventing employment.   Plaintiff was hospitalized for one month and was subsequently placed on disability for over six months, which provided her only source of income.

109.    While on disability, Plaintiff's monthly loan payments amounted to a substantial amount of her disability benefits.   Together, the combined payment for her two federal loans – roughly, $148 and $58 – was more than half of her entire monthly disability benefit.   Plaintiff could not continue to make her payments at their current levels.

110.    Plaintiff contacted Navient to inquire about her options to reduce her monthly payment based on her medical condition and disability status.   Navient told her that she would need to continue paying the entire monthly payment.   When Plaintiff emphasized she could not afford the monthly payment, Navient's customer service representatives placed her in forbearance.

111.    Navient never informed Plaintiff about, nor determined her eligibility for, IDR despite the fact Plaintiff informed Navient that her disability may be long term.   Furthermore, Navient neglected to inform Plaintiff about federal programs to forgive student loan debt for

borrowers who are totally or permanently disabled.  Instead, Navient told Plaintiff she had only two choices: pay the full amount or enter forbearance.

112.    As such, Plaintiff spent eight months continuously in forbearance until she could return to work in January 2017.   In January, Plaintiff successfully paid her monthly loan payment.

113.    Sadly, in February 2017, Plaintiff's condition returned, rendering her unable to work.  She informed Navient by phone and was again placed in forbearance without any indication that she may qualify for IDR programs.  Navient additionally failed to inquire into whether her disability was total and permanent, potentially qualifying her for disability discharge of her federal student loan debt.

114.    With the return of her condition and without meaningful assistance from Navient, Plaintiff inquired about potential repayment options given her disability.  She twice sent in requests to Navient for disability forgiveness but Navient responded to neither.

115.    Plaintiff never knew about IDR programs or that she may be eligible for reduced monthly payments.  Navient, despite being directly contacted by Plaintiff, never informed her of any other repayment options.  Rather, Navient maintained that Plaintiff could either pay the entire monthly payment, despite her debilitating medical condition and significantly reduced monthly income, or enter forbearance.

116.    While Plaintiff has suffered, Navient has continued to harass Plaintiff and her parents as cosigners of her loans.  Seeking to obtain the full monthly loan payment, Navient has contacted Plaintiff's parents upwards of 8-10 times daily.  Navient's aggressive collections actions continued even when Plaintiff was placed on forbearance.

117.    Plaintiff suffered both financial harm and emotional distress because of Navient's utter lack of interest in providing her meaningful assistance with repaying her loans.

## CLASS ALLEGATIONS

118.    Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class:

> All individuals who are direct student loan borrowers from the federal government and who had at least one federal loan serviced by Navient and/or any of its predecessors between January 1, 2010 and the present who were placed in forbearance.

119.    Alternatively, Plaintiff brings this action on behalf of herself and on behalf of a New York subclass pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure seeking certification of the following class:

> All residents of New York who are direct student loan borrowers from the federal government and who had at least one federal loan serviced by Navient and/or any of its predecessors between January 1, 2010 and the present who were placed in forbearance.

120.    **Numerosity.**  Consistent with Rule 23(a)(1), the Class is so numerous and geographically dispersed that joinder of all Class members is impracticable.  Plaintiff believes that there are tens of thousands, if not more, members of the Class.  Class members may be identified through objective means.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

121.    **Commonality and Predominance.**  Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common question of law and fact

that predominate over any questions affecting individual Class members. These common questions include, but are not limited to:

      a.   Whether Navient misled borrowers as to the services they would provide on the federal student loans they serviced;

      b.   Whether Navient improperly incentivized employees to shorten the length of their calls with borrowers, thus encouraging employees to omit information about IDR programs;

      c.   Whether Navient's contract with the Department of Education obligated it to inform borrowers of IDR programs, assist with applications for IDR, and determine eligibility for IDR;

      d.   Whether borrowers are significantly injured by being placed in forbearance, sometimes prolonged forbearance, rather than being placed in an IDR program; and,

      e.   Whether members of both Class were damaged by Navient's misrepresentations, omissions, and mismanagement of federal student loans.

122. **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is typical of members of the Class. Plaintiff is a borrower of student loans from the federal government, serviced by Navient, who were placed in forbearance pursuant to Navient's common scheme. By being placed in forbearance, the amount Plaintiff and the Class owed was subject to interest increasing the principal balance of the loan instead of placing Plaintiff and the Class in a plan allowing them to make smaller payments over a longer time. Plaintiff's injures are akin to other class members and Plaintiff seeks relief consistent with the relief owing to the Class.

123. **Adequacy**.  Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter to obtain relief for herself and for the Class.  Plaintiff has no conflicts of interest with the Class.  Plaintiff has also retained counsel competent and experienced in complex class action litigation.  Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

124. **Superiority**.  Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual Plaintiff may not be sufficient to justify individual litigation.  Here, the damages suffered by Plaintiff and the Class may be relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable.  Individual litigation by each Class member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

### Violations of Delaware Consumer Fraud Act, 6 Del. C. 1953, § 2513, et seq., On behalf of the Nationwide Class.

125.    Plaintiff re-alleges all of the foregoing paragraphs as though fully restated herein.

126.    The Delaware Consumer Fraud Act ("DCFA") makes unlawful:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby.

127.    The DCFA was enacted to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within the state" and covers fraud related to the sale, lease, or advertisement of "any objects, wares, goods, commodities, intangibles, real estate or services."

128.    Navient is headquartered in Wilmington, Delaware, where Jack Remondi, Navient's President and CEO, and other Navient leadership members are located.  Many of Navient's promises regarding its ability and willingness to assist borrowers in choosing the best repayment options were created in and disseminated from Delaware.

129.    Navient consistently informed its customers, including federal student loan borrowers with loans serviced by Navient, they could rely on Navient to examine borrowers' financial situations and determine the best repayment plan.  Statements inducing customers to rely on Navient were, and still are, available on Navient's website and Navient's blog, and Jack Remondi made numerous such statements available in various mediums.

130.    Although Navient frequently encouraged borrowers to rely on it to determine the best borrower-specific repayment plans, Navient failed to follow through on that promise. Navient instead implemented a forced-forbearance approach which was simply Navient's most cost-effective strategy rather than being cased upon a genuine assessment of the borrower's eligibility for IDR.   Navient's failure to actually analyze borrowers' situations and determine their best repayment plan rendered their promises illusory.

131.    Navient's promises were material to the borrowers' whose loans Navient serviced.  As Navient advertised, Plaintiff and the Class sought Navient's help and advice in pursuing their repayment options.  Navient, however, failed to deliver.

132.    Borrowers were also harmed by Navient's omission of material information. Navient had a duty to borrowers created by its promise to fully assist borrowers in choosing their repayment options.  When Plaintiff and the Class contacted Navient explaining their financial complications, Navient failed to inform them of all possible options.  Rather than engaging in a good-faith assessment of IDR qualification, Navient assessed borrowers according to its profit driving model.

133.    As a result of Navient's strategy to cost-effectively deal with borrowers in distress rather than according to law, Plaintiff and the Class were harmed because they were denied the required servicing they were entitled to.  Forbearance does not come with the rights that other options may come with and the denial of any meaningful opportunity to pursue those rights injured Plaintiff.  Plaintiff took out loans pursuant to a Master Promissory Note, which included servicing.  Plaintiffs had a right to rely upon the law and upon Navient's representations as to what services they were providing (which they did not provide as described herein.)  This is especially true for disabled borrowers, who may have been eligible for additional options, which

Navient did not assess in good faith as it was required to do as the servicer of federal loans. Navient implemented a strategy that was cost-effective for its business, but costly for Plaintiff and the Class. Navient's misleading and false advertisements suggesting it was serving borrowers' best interests deceived Plaintiff and the Class, costing them significant money and setting back their progress towards repayment on an IDR plan and possibly, loan forgiveness or disability discharge.

134. Should Navient continue to implement its forced-forbearance approach while simultaneously asserting in public that it pursues the best repayment options for borrowers, Plaintiff and the Class will continue to be harmed.

135. As a result of the foregoing, Plaintiffs and the Classes are entitled to compensatory damages and all other relief deemed just and equitable by the Court.

## COUNT II

### _Breach of Contract Injuring Third-Party Beneficiary_,
### On behalf of the Nationwide Class and the New York Subclass.

136. Plaintiff re-alleges all of the foregoing paragraphs as though fully restated herein.

137. The Department of Education and Navient entered into a servicing contract whereby Navient was contractually responsible for servicing federal student loans taken out by Plaintiff and the Classes. The contract expounds that "[w]ith the sudden increase in current and potential loan volume that the Department will be responsible for servicing, the need for increasing the Title IV student aid servicing vehicles is . . . appropriate at this time."

138. As part of its contractual duties, Navient is obligated to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." This includes "collection and default aversion activity on loans serviced under this contract as long as the loan

remains on the servicer's systems." In the supplemental additions to the Servicing Contract, the Government makes clear its goal to "promote the reduction of loan delinquency across the entire period of vender performance."

139. Navient breached its contract with the Department of Education by failing to properly service borrowers' federal student loans and instead, focusing on its own profits. The Servicing Contract states "the service[r] must provide innovative measures to ensure portfolio growth is not the key driver of total cost. Contractor incentive must be based on performing assets, rather than transaction or activity based delinquency incentives. Costs may also be managed through redistribution of customers . . . The contractor(s) will provide a service flexible enough to handle new requirements generated by Congress and respond to legislative mandates and policy changes." The Department therefore clearly implemented a policy of encouraging servicers to educate borrowers about repayment options and to help borrowers assess their best repayment options.

140. Navient failed to educate borrowers about IDR plans and failed to assist borrowers in choosing an appropriate repayment plan, services Plaintiff and the Classes were entitled to under Navient's Servicing Contract with the Department. Rather than inform borrowers about IDR plans, Navient pushed borrowers towards forbearance, causing Plaintiff and the Classes to delay payment at a cost rather than continue payment via an IDR plan. Navient's purpose in forcing forbearance was its own overall profit caused by limiting customer service expenses.

141. Plaintiff and the Classes are intended third-party beneficiaries under the Servicing Contract. The Department of Education specifically contracts with Navient for the purpose of servicing Plaintiff and the Classes' federal student loans. In the Master Promissory Note

("MPN"), the contract between the borrower and the Department of Education, the Department states a third-party may service the loan and directs borrowers to their servicers for loan-related issues.  Again, after the loan repayment period has begun, the Department of Education directs borrowers to contact their loan servicers for information about repayment issues, including IDR options.

142.    Plaintiff and the Classes relied on the contract between the Department and Navient when pursuing the repayment of their loans.  Plaintiff and the Classes' agreement with the Department of Education, through the MPN, informed the classes of their rights to loan service and that third-party servicers would service their direct federal loans.  Plaintiff and the Classes trusted Navient to adhere to its role as a servicer, including advising Plaintiff and the Classes whether they are eligible for IDR plans.

143.    Navient's breaches cost borrowers significantly, including increasing the overall amounts borrowers have paid and owe for their loans, denying the opportunity to take part in alternative repayment plans, delaying the opportunity to seek loan forgiveness, erasing reduced interest rates available for borrowers in repayment, and the addition of unpaid interest to the principal balance of their loans.

144.    As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things, compensatory damages and all other relief deemed just and equitable by the Court.

## COUNT III

### *Violations of N.Y. Gen. Bus. Law § 349*,
### On behalf of the New York Subclass.

145.    Plaintiff re-alleges all of the foregoing paragraphs as though fully restated herein.

146.    New York Gen. Bus. Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce."

147.    Plaintiff and the New York subclass reside in New York, where they made payments to and had contacts with Navient representatives.

148.    Navient consistently informed its customers, including federal student loan borrowers with loans serviced by Navient, they could rely on Navient to engage in a proper analysis and determine the appropriate repayment plan.  Statements inducing customers to rely on Navient were, and still are, available on Navient's website and Navient's blog, and Jack Remondi made numerous such statements available in various mediums.  Examples include the following:

a. "[Navient is] committed to giving you the information and tools you need to understand and evaluate your student loan payment options.  We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost."[86]

b. "[I]f you're having trouble, there are options for assistance, including income-driven repayment plans, deferment, forbearance, and solutions to help you avoid delinquency and prevent default . . . We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules. Contact us at 800-722-1300 and let us help you make the right decision for your situation."[87]

c. "If you're experiencing problems making your loan payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation."[88]

---

[86] CFPB Complaint at ¶ 39.

[87] *Id.* at ¶ 38.

[88] *Id.*

d. "At Navient, we make it a priority to educate our federal borrowers about income-driven options, with more than 170 million communications annually about repayment options. These programs are our primary tool in helping borrowers avoid default. As a result, we are a leader in enrolling borrowers in these programs."[89]

149. Navient's promises to analyze and place borrowers in appropriate repayment plans were made for the purpose of influencing borrowers' decision-making, steering borrowers towards federal loans serviced by Navient so Navient could appear to conform to its contractual requirements under its Servicing Agreement with the Department of Education.  However, Navient did not follow through with its promises.

150. Instead of honoring its promises, Navient implemented a forced-forbearance approach.  Navient promised to analyze and inform borrowers regarding appropriate repayment options, but failed to do so pursuant to a uniform business model that guided customers away from IDR plans and into forbearance, regardless of their circumstances.

151. Navient's promises were material to the borrowers whose loans Navient serviced.  As Navient advertised, Plaintiff and the Class sought Navient's help and advice in pursuing their repayment options.  As alleged herein, failed to deliver.

152. Borrowers were also harmed by Navient's omission of material information.  Navient had a duty to borrowers created by its promise to fully assist borrowers in choosing their repayment options.  When Plaintiff and the Class contacted Navient explaining their financial complications, Navient failed to inform them of IDR options and alternatives to forbearance.

---

[89] Jack Remondi, *It's Time To Put Students First*, Medium (May 23, 2016), https://medium.com/@JackRemondi/its-time-to-put-students-first-7cd578ca266e

Rather than engaging in a good-faith assessment of IDR qualification, Navient assessed borrowers according to its uniform profit driving model.

153.    As a result of Navient's strategy to cost-effectively deal with borrowers in distress rather than according to its legal obligations, Plaintiff and the Classes were harmed because they were denied the required servicing they were entitled to.  Forbearance does not come with the same rights and obligations as other options and the denial of any meaningful opportunity to pursue those rights injured Plaintiff.  Plaintiff took out loans pursuant to a Master Promissory Note, which included the right to adequate servicing.  Plaintiffs had a right to rely upon the MPN and upon Navient's representations as to what services they were providing (which they did not provide as described herein.)  This is especially true for disabled borrowers, who may have been eligible for additional options, which Navient did not assess in good faith as it was required to do as the servicer of federal loans.

154.    Navient implemented a strategy that was cost-effective for its business, but ultimately, costly for Plaintiff and the Classes.  Navient's misleading and false statements suggesting it was serving borrowers' best interests deceived Plaintiff and the Classes, costing them significant money and setting back their progress towards repayment.

155.    Should Navient continue to implement its forced-forbearance approach while simultaneously asserting to the public that it pursues the best repayment options for borrowers, Plaintiff and the Classes will continue to be harmed.

156.    As a result of the foregoing, Plaintiff and the Classes are entitled to among other things, compensatory damages, treble damages, and all other relief deemed just and equitable by the Court, including but not limited to reasonable attorneys' fees and costs.

## COUNT IV

### *Declaratory Judgment*
**On Behalf of the Nationwide Class and New York Subclass.**

157.    Plaintiff re-alleges all of the foregoing paragraphs as though fully restated herein.

158.    Navient's Servicing Contract with the Department of Education requires it to provide adequate and proper services related to federal student loan servicing.  These services include, among other things, assistance in educating borrowers about their repayment options and assisting borrowers in determining appropriate repayment plans.  Furthermore, Navient is compelled under the Servicing Contract to render these services without concerns of the cost, which the Department of Education can manage by adjusting the number of borrowers assigned to various servicers.

159.    Despite its obligations, Navient declined to fulfill its duties.  Instead, Navient implemented an approach geared towards reducing its own costs while abandoning its role as a federal student loan servicer, a role that other servicers have adequately implemented.  Navient, in the meantime, has ballooned to become the largest federal student loan servicer, servicing nearly $300 billion in student loans,[90] in part through its approach of reducing costs related to student loan servicing.

160.    Should Navient continue to implement its forced-forbearance approach while simultaneously asserting in public that it pursues the best repayment options for borrowers, Plaintiff and the Classes will continued to be harmed.

---

[90] Kevin McCoy, Attention Borrowers: Navient Could Soon Be Your New Student Loan Servicer, USA Today (Apr. 19, 2017), https://www.usatoday.com/story/money/2017/04/19/attention-borrowers-navient-could-soon-your-new-student-loan-servicer/100642690/

161.    As a result of the foregoing, Plaintiff and the classes are entitled to declaratory relief to prevent further harm.  Namely, Plaintiff and the Classes are entitled to a declaration that Navient has a contractual responsibility to fulfill its role as a proper student loan servicer and provide borrowers with assistance in understanding and choosing repayment plans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf and on behalf of the Classes, prays for the following relief:

A.      An order that this action may proceed as a class action under the Federal Rule of Civil Procedure Rule 23 with Plaintiff as the Class Representative;

B.      An order declaring the conduct of Navient as alleged herein is unlawful;

C.      An order enjoining Defendants from continuing the unlawful practices alleged herein;

D.      An order awarding Plaintiff and the Classes all damages to which they are entitled under the law, along with pre- and post-judgment interest;

E.      An order granting Plaintiff and the Classes the costs of the suit, including reasonable attorneys' fees and expenses as allowed by law; and,

F.       An order awarding any other further relief to which Plaintiff and the Classes may be entitled.

## JURY DEMAND

Plaintiff respectfully demands a jury trial on all matters so triable.

Respectfully submitted,

Dated: August 18, 2017                 **REESE LLP**

*/s/ Michael R. Reese*
Michael R. Reese
George V. Granade
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile:  (212) 253-4272
*mreese@reesellp.com*
*ggranade@reesellp.com*

Brian C. Gudmundson
Bryce D. Riddle
Michael J. Laird
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Telephone:  (612) 341-0400
Facsimile:  (612) 341-0844
*brian.gudmundson@zimmreed.com*
*bryce.riddle@zimmreed.com*
*michael.laird@zimmreed.com*

Arthur M. Murray
Stephen B. Murray
Robin M. Myers
**MURRAY LAW FIRM**
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130
Telephone:  (504) 525-8100
Facsimile:  (504) 584-5249
*amurray@murray-lawfirm.com*
*smurray@murray-lawfirm.com*
*rmyers@murray-lawfirm.com*

53

Gary F. Lynch
**CARLSON LYNCH SWEET KILPELA &
  CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
*glynch@carlsonlynch.com*

Bryan L. Bleichner
**CHESTNUT CAMBRONNE**
17 Washington Avenue North - Suite 300
Minneapolis, Minnesota 55401
Telephone: (612) 339-7300
Facsimile: (612) 336-2940
*bbleichner@chestnutcambronne.com*

*Counsel for Plaintiff and the Proposed Class*